# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Bankruptcy Nos. |
| | : | |
| SOUTH CANAAN CELLULAR | : | 09-10473, 09-10474 |
| INVESTMENTS, LLC and SOUTH | : | |
| CANAAN CELLULAR EQUITY, LLC | : | (Jointly Administered) |

| | | |
|---|---|---|
| LACKAWAXEN TELECOM, INC. | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | NO. 09-CV-2840 |
| SOUTH CANAAN CELLULAR | : | |
| INVESTMENTS, LLC and SOUTH | : | |
| CANAAN CELLULAR EQUITY, LLC | : | |

## MEMORANDUM AND ORDER

**JOYNER, J.**                                                     **November 3, 2009**

By this appeal, Appellant Lackawaxen Telecom, Inc. ("LTI") seeks reversal of the May 19, 2009 Memorandum Decisions issued by U.S. Bankruptcy Judge Bruce Fox denying its Motions to Dismiss these two jointly administered Chapter 11 Bankruptcy matters. For the reasons which follow, we shall affirm the decisions[1] of the Bankruptcy Court.

## Statement of Relevant Facts

The debtors in this action are South Canaan Cellular Equity, LLC and South Canaan Cellular Investments, LLC (hereafter "SCCE" or "Equity" and "SCCI" or "Investments," respectively), both of which were formed for the purpose of holding partnership

---

[1] Because the decisions are, for all intents and purposes, identical, we hereafter refer to them in the singular.

interests in South Canaan Cellular Communications Company, LP, a Limited Partnership ("SCCCC") in the business of providing wireless communications services in Northeastern Pennsylvania's Pike and Wayne Counties.  Specifically, Equity holds a 39.8% limited partnership interest, whereas Investments holds a 1% interest in SCCCC and acts as its general partner. SCCCC has two other limited partners, neither of which are debtors here.  South Canaan Cellular Telephone ("SCTC") holds a 10.2% limited partnership interest and SCCTC, a Delaware Corporation is the final limited partner with a 49% interest.

The two debtor entities are owned by four families.  The Edwards family holds interests in SCCI and SCCE of approximately 42-43%, Frank Coughlin (who is the President of LTI) holds an interest of 30.8%, the Copp family owns 24% and the Miller family holds a less than 1% interest.  Carolyn Copp is the Chairman, sole member of the Board of Managers and President of SCCI and the Chairman of the Board of Managers and President of SCCE. Both entities have Ms. Copp's personal residence in West Chester, PA as their principal places of business.  Neither of the debtor LLCs have any employees or operating income; their sole source of income comes from potential partnership distributions, although no such distributions have been made since 2002.

In 2008, SCCCC had approximately 7,900 subscribers which accounted for some 16.8% of the company's revenue for that year.

The vast majority of SCCCC's revenue, however, was attributable to the payment of "roaming" fees charged by SCCCC to Verizon Wireless pursuant to a three-year agreement, for providing wireless services to Verizon's customers who are traveling through SCCCC's service territory. While that agreement was due to expire in June 2009, it has successive one-year renewal terms with 90 days' notice such that unless SCCCC receives notice from Verizon that it intends to terminate the agreement, it will automatically renew for a one-year term. Although the possibility certainly exists that Verizon could negotiate a rate reduction, it is highly unlikely that Verizon would terminate its relationship with SCCCC because Verizon would be required to build its own infrastructure[2] or risk not being able to provide service to a large number of customers adjacent to its head-quarters and where many of its executives have vacation homes.

On or about October 26, 2000, SCCE and SCCI entered into a master loan agreement (and supplement) with and executed a promissory note in favor of Co Bank ACB in the amount of $7.5 million. These funds were utilized by SCCE and SCCI to acquire their interests in SCCCC and to upgrade SCCCC's wireless system from analog to digital and to make other network improvements. Together with the master loan documents, SCCE and SCCI also

---

[2] Ms. Copp estimated that Verizon would have to build some four sites to SCCCC's one and this would likely take several years to accomplish. (N.T. 3/4/09, 142-143).

3

entered into a security agreement whereby they granted security interests in all of their property, as well as their interests in the SCCCC limited partnership, to Co Bank. The non-debtor SCTC likewise provided Co Bank with a pledge of its partnership interest. The outstanding principal balance of the loan was to be repaid in 26 consecutive quarterly payments due on the 20th day of January, April, July and October of each year beginning in October 2002 through January, 2009.[3] The loan documents provided that, except to the extent governed by applicable federal law, the agreements would be governed by and construed in accordance with the laws of Colorado and that the debtor entities agreed and consented to submit to the jurisdiction of the Colorado state and/or federal courts in the event that the Secured Party should elect to file any legal action or proceeding as the result of a dispute arising out of the parties' agreements.[4] In addition, under Section 4 of the Agreements,

> "[s]o long as no Event of Default hereunder shall have occurred and be continuing, Pledgor shall have the right to receive any Distributions and exercise all of its voting, consensual and other powers of ownership pertaining to the Collateral for all purposes not inconsistent with the terms

---

[3] According to Carolyn Copp's testimony before the Bankruptcy Court on March 4, 2009, during the first two years of the loan, the quarterly payments were to consist of interest only, followed by the payment of quarterly payments consisting of both principal and interest. (N.T. 3/4/09, 29).

[4] These provisions also, however, permitted the lender to file suit in any other forum of competent jurisdiction. ("Nothing contained herein shall affect the right of Secured Party to commence legal proceedings or otherwise proceed against the Pledgor in any other jurisdiction or to serve process in any manner permitted or required by law.")

4

of this Pledge Agreement or any of the other Loan Documents. Upon the occurrence and during the continuance of an Event of Default and subject to the provisions of Section 13 of this Pledge Agreement, all rights of Pledgor to exercise its voting, consensual and other powers of ownership pertaining to the Collateral shall become vested in Secured Party upon two days' prior written notice from Secured Party to Pledgor and the Pledged Partnership, and thereupon Secured Party shall have the sole and exclusive authority to exercise such voting, consensual and other powers of ownership which Pledgor shall otherwise be entitled to exercise; provided, however, that this shall not be construed as prohibiting Pledgor from contesting the existence of an Event of Default."

Although the debtors made the first two quarterly payments on the loan, no further payments were made and the loan went into default in May, 2003. Shortly after the default occurred, however, the debtors commenced negotiations with Co Bank to resolve the debt; those negotiations continued until September 2007, when LTI purchased and took assignment of the loan from Co Bank. Although discussions apparently continued between SCCI, SCCE and LTI toward repayment of the loan subsequent to LTI's purchase, they proved unsuccessful in large part, according to Ms. Copp, because Mr. Coughlin was seeking to gain control of the debtor entities and refused to discuss settlement until such time as he had replaced Ms. Copp as president.[5]

---

[5] There is clearly a difference of opinion between Ms. Copp and Mr. Coughlin over the best way to manage and run the operations of SCCCC, SCCI and SCCE. As summarized by Judge Fox,

"Mr. Coughlin, who has prior experience with cellular networks, believes that SCCCC's revenue dependence on roaming fees with Verizon Wireless places the partnership and its partners at undue risk. He seeks to replace Ms. Copp as president of the general partner, SCCI, and may seek to sell SCCCC as a going concern. Ms. Copp, in turn, has no confidence in Mr. Coughlin's managerial skills and fears that the operations of

5

On January 23, 2009, Mr. Coughlin writing in his capacity as President of and on behalf of LTI, sent written notice to Ms. Copp and to SCCI, SCCE, SCTC and SCCCC that:

> "[p]ursuant to Section 4 of the Partnership Interests Pledge Agreements with the LLC's and South Canaan Telephone Company ... all rights of the LLC's and SCTC to exercise their respective voting, consensual and other powers of ownership pertaining to the 1% general partnership interest of SCCI and 50% limited partnership interests of the SCCE and SCTC in ... SCCCC shall become vested in LTI two days after the date of this notice, and thereupon that LTI shall have the sole and exclusive authority to exercise such voting, consensual and other powers of ownership in SCCCC, ..."

and that:

> LTI was "commencing litigation in Colorado to confirm our right to take this action in the event it may be opposed."

Apparently, on or about January 23, 2009, LTI did file a Verified Complaint and Request for Declaratory Relief in the Colorado District Court for the City and County of Denver, Colorado against SCCE, SCCI and SCTC which suit sought, *inter alia*, money damages for breach of the loan documents in the amount of the unpaid principal of $7,120,413 together with accrued interest, attorney's fees and costs as well as a declaratory judgment that LTI may exercise and enforce all of its rights and remedies under the said loan documents.

---

SCCCC would be hindered by his assuming control, to the detriment of the limited partners and the creditors of those limited partners. Mr. Coughlin, in rebuttal, questions Ms. Copp's judgment in permitting SCCCC to retain millions of dollars without making distributions to its limited partners."
(Memorandum Opinion of 5/19/09, pp. 6-7)

6

On January 25, 2009, shortly before the 48-hour notice period expired, SCCI and SCCE filed voluntary bankruptcy petitions for reorganization under chapter 11 of the Bankruptcy Code. These filings were apparently intended to and did invoke the automatic stay of 11 U.S.C. §362 thereby preventing the loss of the debtor's voting rights in SCCCC and enjoining the fixing of LTI's secured claim by the Colorado state court. Then, on January 29, 2009, the debtors filed a Notice of Removal of the Colorado state court action to the United States District Court for the District of Colorado pursuant to 28 U.S.C. §§1334, 1446 and 1452 and Fed. R. Bankr. P. 9027. They then sought to transfer venue to this district under 28 U.S.C. §1412. Not surprisingly, LTI opposed this motion and on April 1, 2009, the U.S. District Court for the District of Colorado remanded only LTI's claims against non-debtor SCTC to the Colorado state court recognizing that LTI's suit against SCCE and SCCI was enjoined by §362(a). In the meantime, LTI filed the motion to dismiss the within bankruptcy cases for bad faith which Judge Fox denied via Memorandum and Order of May 19, 2009 and which is the subject of this appeal.

### **Applicable Standard of Review**

Under 28 U.S.C. §158(a), the District Courts are given jurisdiction "to hear appeals

(1) from final judgments, orders, and decrees;

7

> (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
>
> (3) with leave of court, from other interlocutory orders and decrees;
>
> of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

And, under Fed. R. Bankr. P. 8013,

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

In considering such bankruptcy appeals, the district courts are thus generally required to review the bankruptcy court's findings of fact for clear error and apply plenary review to its conclusions of law. Wawel Savings Bank v. Jersey Tractor Trailer Training, Inc., 580 F.3d 147 (3d Cir. 2009); Sterten v. Option One Mortgage Corp., 546 F.3d 278, 282 (3d Cir. 2008); IRS v. Pransky, 318 F.3d 536, 542 (3d Cir. 2003). More specifically, a bankruptcy court's refusal to dismiss a Chapter 11 petition for want of good faith is reviewed for abuse of discretion; such an abuse exists where the decision rests on a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. In re Integrated Telecom Express,

8

Inc., 384 F.3d 108, 118 (3d Cir. 2004).

## Discussion

As noted above, the issue on appeal in this case is the propriety of Judge Fox's denial of LTI's motion(s) to dismiss the bankruptcy petitions of SCCI and SCCE pursuant to 11 U.S.C. §305(a) and 1112(b).[6] Although not specifically included in the

---

[6]

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a  Specifically, those sections, state, in relevant part:

**§305. Abstention**

The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if -

    (1) the interests of creditors and the debtor would be better served by such dismissal or suspension; or

    (2)(A) a petition under section 1515 for recognition of a foreign proceeding has been granted; and

      (B) the purposes of chapter 15 of this title would be best served by such dismissal or suspension.

**§1112. Conversion or dismissal**

.....
(b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

(2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that -

>                (A) there is a reasonable likelihood that a plan will be confirmed
>                within the time frames established in sections 1121(e) and 1129(e)
>                of this title, or if such sections do not apply, within a
>                reasonable period of time; and
>
>                (B) the grounds for granting such relief include an act or
>                omission of the debtor other than under paragraph (4)(A)--
>
>                        (i) for which there exists a reasonable justification for
>                        the act or omission; and
>
>                        (ii) that will be cured within a reasonable period of time
>                        fixed by the court.
>
>                                ....
>
> (4) For purposes of this subsection, the term 'cause' includes -
>
> (A) substantial or continuing loss to or diminution of the estate and
> the absence of a reasonable likelihood of rehabilitation;
>
> (B) gross mismanagement of the estate;
>
> (C) failure to maintain appropriate insurance that poses a risk to the
> estate or to the public;
>
> (D) unauthorized use of cash collateral substantially harmful to 1 or
> more creditors;
>
> (E) failure to comply with an order of the court;
>
> (F) unexcused failure to satisfy timely any filing or reporting
> requirement established by this title or by any rule applicable to a
> case under this chapter;
>
> (G) failure to attend the meeting of creditors convened under section
> 341(a) or an examination ordered under rule 2004 of the Federal Rules of
> Bankruptcy Procedure without good cause shown by the debtor;
>
> (H) failure timely to provide information or attend meetings reasonably
> requested by the United States trustee (or the bankruptcy administrator,
> if any):
>
> (I) failure to timely pay taxes owed after the date of the order for
> relief or to file tax returns due after the date of the order for
> relief;
>
> (J) failure to file a disclosure statement, or to file or confirm a
> plan, within the time fixed by this title or by order of the court;
>
> (K) failure to pay any fees or charges required under chapter 123 of
> title 28;
>
> (L) revocation of an order of confirmation under section 1144;
>
> (M) inability to effectuate substantial consummation of a confirmed

definition of "cause" for dismissal of a bankruptcy petition, the Third Circuit has determined that Chapter 11 bankruptcy petitions are also subject to dismissal under Section 1112(b) unless filed in good faith.  In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999).  The debtor bears the burden of establishing good faith.  In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 210-211 (3d Cir. 2003).

In assessing whether the good faith requirement of 11 U.S.C. §1112(b) is satisfied, a "fact intensive inquiry" must be undertaken "in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'"  In re Integrated Telecom, supra, quoting SGL Carbon, 200 F.3d at 162.  At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy, which the Supreme Court has identified as: (1) "preserving going concerns," and (2) "maximizing property available to satisfy creditors."  Id., quoting Bank of America National Trust and

---

plan;
condition specified in the plan; and

    (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

Savings Association. v. 203 North LaSalle Street Partnership, 526 U.S. 434, 453, 119 S. Ct. 1411, 143 L. Ed. 2d 607 (1999). If neither of these purposes can be demonstrated, the petition should be dismissed. In re American Capital Equipment, LLC, 226 Fed. Appx. 270, 273, 2008 U.S. App. LEXIS 21795 at *7 (3d Cir. Oct. 16, 2008).

Likewise, if the sole purpose of the bankruptcy filing is to obtain a tactical litigation advantage, the petition is considered to have fallen outside the legitimate scope of the bankruptcy laws and may properly be dismissed. Id.; SGL Carbon, 200 F.3d at 165. Additional factors that have been held to bear on whether subjective bad faith in filing and/or objective futility in legitimately reorganizing exists include:

(1) the debtor has few or no unsecured creditors;

(2) there has been a previous bankruptcy petition by the debtor or a related entity;

(3) the prepetition conduct of the debtor has been improper;

(4) the petition effectively allows the debtor to evade court orders;

(5) there are few debts to non-moving creditors;

(6) the petition was filed on the eve of foreclosure;

(7) the foreclosed property is the sole or major asset of the debtor;

(8) the debtor has no ongoing business or employees;

(9) there is no possibility of reorganization;

(10) the debtor's income is not sufficient to operate;

(11) there was no pressure from non-moving creditors;

(12) reorganization essentially involves the resolution of a two-party dispute;

(13) a corporate debtor was formed and received title to its major assets immediately before the petition; and

(14) the debtor filed solely to create the automatic stay.

In re DCNC North Carolina I, LLC, 407 B.R. 651, 662 (Bankr. E.D. Pa. July 13, 2009); In re SB Properties, Inc., 185 B.R. 198, 205 (E.D. Pa. 1995), citing, Mellon Bank v. Selig, 1993 Bankr. LEXIS 2240 (Bankr. M.D. Pa. July 8, 1993). The decision to dismiss a petition for lack of good faith rests within the sound discretion of the bankruptcy court which should not lightly infer a lack of good faith and should utilize its powers of dismissal on this basis only in egregious cases. See, Perlin v. Hitachi Capital America Corp., 497 F.3d 364, 373 (3d Cir. 2007); In re Tamecki, 229 F.3d 205, 207 (3d Cir. 2000).

The application of §305(a) is an extraordinary remedy appropriate only when the interests of the creditor and the debtor are best served by dismissal. In re Mazzocone, 200 B.R. 568, 574 (E.D. Pa. 1996). Similar to §1112, dismissal under §305 is left to the discretion of the Bankruptcy Court, which in making this decision, considers a wide variety of factors including but not limited to: who filed the bankruptcy petition, the availability of another forum to handle the pending disputes, the necessity of federal proceedings to achieve a just and

equitable solution, the expense of the federal proceedings in comparison to the proceedings in another forum, the purpose of the party seeking to remain in bankruptcy court, the economy and efficiency of having the bankruptcy court handle the matter and the possible prejudice to various parties. In re Argus Group 1700, Inc., 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996); In re Mazzocone, supra. The evidentiary burden is upon the party seeking dismissal under §305(a). In re Mylotte, David & Fitzpatrick, 2007 Bankr. LEXIS 3572, at *17, 58 Collier Bankr. Cas. 2d (MB) 1296 (Bankr. E.D. Pa. Oct. 11, 2007).

In applying all of the preceding legal principles to the case at hand, we cannot find any errors in Judge Fox's findings of fact, his conclusions of law or his application of those facts to the law. Indeed, prior to making his decision in this matter, Judge Fox held a day-long hearing on the motion to dismiss on March 4, 2009. At that time, the Court heard from three witnesses – (1) Carolyn Copp, the Chairman, sole member of the Board of Managers and President of SCCI and the Chairman of the Board of Managers and President of SCCE, (2) Frank Coughlin, the President of LTI and the owner of a 30.8% interest in SCCI and SCCE and (3) William Redpath, who testified as an expert witness on the matter of business valuations. Ms. Copp testified that although the debtors originally defaulted on the underlying loan obligation in May, 2003, they had been in negotiations for some 4

14

years to resolve the debt with the lender, Co Bank. In fact, the negotiations continued until LTI purchased and was assigned the loan from Co Bank. Over that four-year period and thanks in large part to the forbearance of Co Bank however, SCCCC was able to upgrade its network and increase its net revenues from $4.7 million to $14.4 million and its net income from a net loss of nearly $750,000 to a net income of $5.9 million.

Ms. Copp's testimony in this regard was largely un-refuted; Mr. Coughlin's testimony focused on the doubts which he had that the revenue stream would continue to increase given that it came largely from one source – Verizon. Mr. Coughlin further acknowledged that LTI purchased the loan from Co Bank with the intention that Ms. Copp would be replaced as the managing partner of the general partner, that he believed that he would be a better manager and that he believed that this would be a good time to sell SCCCC, although he had yet to explore possible buyers.

Mr. Redpath, an expert in the field of business valuation, opined that the fair market value of SCCCC in an asset sale as a going concern was $50 million.[7] He further gave as an

---

[7] Specifically, Mr. Redpath utilized two differing approaches to valuation of the business(es) -- the discounted income approach, under which he estimated an FMV of $44 million, and the market approach, which resulted in an estimated value of $60 million. The witness stated that he arrived at the $50 million figure because, while he found the market approach somewhat valuable in terms of its data regarding sales of other publicly traded cellular enterprises, the income approach considered more of the specifics involved with this particular cellular business. (N.T. 3/4/09, 115-120).

approximate value of the 51% interest that the limited partners pledged to secure the original Co Bank loan would be some $24 million.[8]

We recognize that several of the factors evincing possible bad faith are present here in so far as the debtors have no employees, no inventory or vendor or supplier contracts, no other real ongoing business operations, and virtually no assets aside from their partnership interests in SCCCC. Their primary creditor is LTI.[9] However, the above evidence also lends credence to the debtors' assertion that the bankruptcy filing was in direct response to the correspondence from LTI that it intended to seize control of the South Canaan Cellular entities and its filing of the action in Colorado, and because of the debtors' desire to take advantage of the protections afforded by a bankruptcy reorganization to (hopefully) protect their equity interests in the LLCs. As the Bankruptcy Court observed, "...given LTI's request for a monetary judgment against the debtors, with the potential for execution upon that judgment that would eliminate the LLCs' partnership interests, continuation of the state court litigation would neither be in the debtors' best interests nor in the interests of its non-LTI creditors."

---

[8] See, N.T. 3/4/09, 119-127.

[9] Indeed, LTI is the debtors' only significant secured creditor. The remaining creditors, the Bauknight, Pietras & Stormer accounting firm, SCTC and SCCCC are all unsecured, and the precise status of the $691 claim by the Pennsylvania Department of Revenue is unclear.

(Memorandum Decision, 5/19/09, p. 26).

We agree that the evidence presented here renders colorable the debtors' claim that they were motivated to file to preserve SCCCC as an ongoing business concern and to maximize its value so as to preserve its equity and satisfy its and its partners' creditors.  As these concerns clearly fall within the "acceptable spectrum" of reasons justifying a valid bankruptcy filing, we can discern no abuse of discretion on the part of the Bankruptcy Court.  The Memorandum Decision of May 19, 2009 shall therefore be affirmed.

An order follows.